## MUNICH RE-INSURANCE COMPANY *vs.* UNITED SURETY COMPANY.

*Election to Affirm or Rescind Contract Obtained by Fraud—
Waiver of Right to Rescind by Inducing Third Parties to
Act upon Promise to Affirm—Answer in Equity Ask-
ing for Cross-Relief—Corporations—Payment of
Capital Stock as Condition of Legal Exist-
ence—Legislative Recognition of Va-
lidity of Corporation.*

When a party who has the right to rescind a contract because
he had been induced to make it by fraudulent representa-
tions as to a material fact, and who has knowledge of the
fraud, says to persons interested in the performance of the
contract, although not parties to the contract itself, that he
will not rescind, provided certain things be done, and these
persons, relying upon this statement, do those things then the
party defrauded has made his election, and the right to re-
scind the contract is lost.

The Munich Co. agreed with the U. Surety Co. to take 333
shares of its capital stock and to enter into a participation
contract with it by which the Munich Co. was to receive one-
third of the profits of the business of the Surety Co. and
to pay one-third of its losses, provided the whole capital
stock of the Surety Co., amounting to 5,000 shares, and a
certain surplus on each share, should first be subscribed for
and paid in.    The then President of the Surety Co. falsely
represented to the Munich Co. that the whole capital and
surplus had been so subscribed for except 237 shares, and that
these and all of the capital and surplus would be paid in
within two weeks.    The Munich Co. then paid for its shares
and executed the participation contract.    The bill in this case
filed by the Munich Co. alleged the fraud and that it had
rescinded the contract and asked for a decree cancelling the
same.    The Surety Co.'s answer alleged that the Munich Co.

had ratified the contract after having knowledge of the fraud, and prayed for an accounting of the indebtedness of that company to it under the terms of the contract. The Munich Co. contended that it had only ratified its subscription to the shares of stock and had not ratified the participation contract. An examination of the evidence in the case shows that after the agents of the Munich Co. had notice that over 2,000 shares of the Surety Co. had not been paid for, together with the surplus, a meeting of the directors of the Surety Co. and other persons interested was held to consider its affairs; that at the meeting a representative of the Munich Co., who had knowledge of the stock subscription and of the participation contract, announced that the Munich Co. would rescind its subscription and the participation contract on account of the false representations; that thereupon the persons present agreed to subscribe for the balance of the capital stock of the Surety Co. and pay for the same and the surplus within two days if the Munich Co. would withdraw its rescission and carry out the contract; that the representative of the Munich Co. agreed to ratify both its stock subscription and its participation contract if that were done; that the remaining shares of stock were immediately subscribed and paid for according to this understanding, and that this action of its representative was authorized and ratified by the Munich Co. *Held,* that under these circumstances, the Munich Co. has waived its right to rescind its agreement with the Surety Co. and the same is binding, and that the Surety Co. is entitled to an accounting under its answer of the indebtedness of the Munich Co. to it under the participation contract.

The defendant in an equity suit may ask for relief against the plaintiff by his answer instead of by cross-bill, but, as a general rule, the plaintiff in his reply to the answer cannot set up new grounds for the relief inconsistent with those in the original bill.

The charter of the U. Surety Co. (Act of 1902, Chap. 479,) contemplated that the whole of its capital stock should be subscribed for before the organization of the company. It did not require that 50% on each share should be actually paid in before organization, but only that 50% of the aggre-

gate capital should be paid. Therefore, when more than that amount had been paid in, and it does not appear that all of the stock had not been subscribed for, a contract made by the Surety Co. is valid, since the company had come into legal existence.

After a Surety Co. had paid its bonus and franchise taxes, and had received a license to do business from the Insurance Commissioner of the State, and had made to the Commissioner a report of business actually done, but when all of its capital stock may not have been subscribed for as required by its charter, an Act of the Legislature was passed to amend the charter and extend its powers in which the company was spoken of as a corporation. *Held,* that this Act is a legislative recognition of the validity of the existing corporation and not merely of the validity of its charter, since the Legislature had the power to relieve it of the necessity of having all its stock subscribed for if such necessity existed under the original charter.

When the answer of a defendant in an equity suit, denying the right of the plaintiff to maintain the bill, asks for relief against the plaintiff, and the facts of the case support the averments of the answer, a decree dismissing the original bill and granting relief to the defendant is proper.

*Decided May 6th, 1910.*

Appeal from the Circuit Court of Baltimore City (HEUISLER, J.).

The cause was argued before BOYD, C. J., BRISCOE. SCHMUCKER, BURKE, THOMAS and URNER, JJ.

*Arthur Geo. Brown, Edgar H. Gans* and *R. E. Lee Marshall,* for the appellant.

*Joseph C. France and Edwin J. Farber,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a decree which dismissed the bill of complaint of the Munich Re-Insurance Company filed against the United Surety Company, decreed that the defendant was entitled to cross-relief as prayed in its answer, and referred the cause to the auditor to ascertain and report the amount, if any, due by the plaintiff to the defendant under what is called a "participation contract." The bill charges that the Munich Company was induced to enter into and execute that contract with the Surety Company through false and fraudulent representations of material facts on the part of the Surety Company and certain of its officers. It alleges that upon discovery of the frauds the Munich Company rescinded the contract and notified the Surety Company that by reason of said frauds the contract was null and void from the beginning, but that the Surety Company had denied the right of the Munich Company to rescind the contract, and had instituted a suit at law to recover damages against it; under the terms and provisions of the contract. It then prayed that a decree might be passed declaring the contract null and void, and cancelling it, and also praying for an injunction restraining the Surety Company from further prosecuting the suit at law.

The defendant answered the bill and neither admitted nor denied the allegations of fraud set out in it, but called for strict proof thereof. It further alleged that it was immaterial whether the charges of fraud and misrepresentations set out in the bill were true or not, for the reason that the plaintiff had ratified and confirmed the contract in question, and had waived any right to rescind it, after discovery of the frauds and with full knowledge thereof. By way of cross-relief the defendant then charged that the plaintiff was indebted unto it under the provisions of the contract in a large sum of money, and prayed for an accounting and a decree in its favor for such amount as might be found to be due.

The Munich Company answered the allegations for cross-relief, alleging that, apart from and in addition to the invalidity of the contract by reason of the fraud and misrepresentations charged in the bill, the Surety Company was not entitled to relief because at the time of the execution of the contract it had not come into being, had no corporate existence and was legally incapable of having or exercising any of the rights or privileges contained in its charter, and was legally incapable of executing or entering into the contract because by its charter it was a condition precedent to acquiring or having any corporate existence or exercising any corporate powers that all of the capital stock of the Surety Company, to wit, five thousand shares, should first be subscribed for, and that fifty per cent. should first be paid in cash, while a large part was unsubscribed for, and far less than fifty per cent. had been paid in cash.

The authorized capital of the Surety Company was five hundred thousand dollars, divided into five thousand shares, of one hundred dollars each. It was determined that the stock be subscribed at one hundred and fifty dollars per share—thus making a surplus of two hundred and fifty thousand dollars, in addition to the authorized capital. Olin Bryan, the then president of the Surety Company, entered into negotiations, in the early part of 1906, with Carl Schreiner, who had charge of the "Foreign Department" of the Munich Company, and had his headquarters in London but spent part of his time in this country, with a view to making a contract with the Munich Company, whereby it should undertake, upon terms to be agreed upon, to participate in some part of the business of the Surety Company and also requested the Munich Company to become a subscriber to the capital stock of the Surety Company. The bill alleges that in the course of the negotiations between them it was understood and agreed, as a condition of the Munich Company entering into the contract and subscribing to the stock, that the whole capital should be subscribed and actually paid into the treasury at the rate of $150.00 per share, without

discount or rebate to anyone, so that the entire capital of $500,000 and $250,000 of surplus should be actually paid in cash and be available for the purposes of the business of the Surety Company. It was agreed that upon those terms, the Munich Company would take three hundred and thirty-three shares, at $150.00 per share, and in order to have a definite and official confirmation of the representations and statements of said Bryan, on March 24th, 1906, Schreiner wrote to the Surety Company requesting it to deliver to the banking firm of Ladenburg, Thalmann & Co., of New York, the three hundred and thirty-three fully paid shares of stock, together with a statement as to its capital, etc. On March 30th, 1906, Bryan, as president, wrote to the banking firm stating that all the shares had been subscribed for at $150.00 per share, no discount or rebate being allowed on a single share to any stockholder, of which there was then paid $443,000 in capital and $221,500 in surplus, making $664,-500, which with the 333 shares subscribed by them would make a total of $714,500 which would leave an unpaid balance of $35,550, being 237 shares, and that all of the capital and surplus would be paid on or before the 15th of April, 1906. The amount of the Munich Company's subscription to the stock was duly paid by two drafts, and the contract, which is at times spoken of in the record as a "participation contract," and in other places as a "re-insurance contract," was executed in duplicate by the Surety Company on March 20th, and by the Munich Company on April 10th, 1906—the duplicates having been sent to the home office at Munich, Bavaria, for execution by that company.

Amongst other provisions in the contract Art. VIII provided for a detailed account by the Surety Company to the Munich Company of certain income and disbursements, and Art. IX in part is, that: "If the account provided for in the preceding article shows a profit, the 'Munich' shall receive one-third (1/3) thereof as its share under the terms of this agreement. If the said account shall show a loss, the 'Munich' will pay one-third (1/3) of said loss to the United."

The bill alleges that approximately 2312½ shares were unsubscribed and unpaid, and only 2687½ shares (including what the Munich Company paid) actually subscribed and paid for; that the plaintiff and its agent, Schreiner, were at the time of making the contract and making the subscription, respectively, entirely ignorant of the true and actual condition of the defendant, and relied on the representations and statements of Bryan, which were false and fraudulent. It is later in the bill alleged that for reasons and considerations stated, the plaintiff did after the discovery of the frauds and misrepresentations, and upon the terms and conditions thereafter set out, waive the said frauds and misrepresentations, in respect to its contract of subscription to said capital stock, and ratified and confirmed it, but at no time since the discovery of the frauds did it waive the same in respect to the participation contract.

During the summer of that year it was discovered that a large number of the shares of stock were not in point of fact *bona fide* paid for, or subscribed as Bryan had led the Munich Company and the officers and directors of the Surety Company, with perhaps one or two exceptions, to believe. Mr. Janney, who was a director and attorney for the Surety Company, at once began investigations which resulted in having a special meeting of the board of directors and some others interested on the evening of August 25th, 1906, at the company's building in Baltimore. The effort to show what took place on that occasion is largely the cause of this voluminous record of nearly eight hundred pages. We are relieved of discussing the falsity of the representations to the Munich Company as to the subscriptions and payment of the stock by the admissions in the appellee's brief.

The case is peculiar because it is admitted by the bill, and shown by the appellant's testimony, that it did on the evening of August 25th, 1906, waive the frauds and misrepresentations in respect to the subscription to the capital stock, and that it ratified and confirmed its contract in reference thereto, but the controversy is whether it also waived its

right to rescind the participation contract: That depends, outside of some questions of law, upon the facts and circumstances shown by the record, and therefore we are called upon to review them at some length.

Mr. Schreiner sailed from this country for London about June 19th, 1906, and did not return again until about the middle of October of that year. The firm of Ladenburg, Thalmann & Co. were the New York bankers of the Munich Company, and Mr. Walter T. Rosen of that firm represented the Munich Company in the Surety Company—having been elected a director in the latter part of March, 1906, as the representative of that company, although the shares of stock stood in the name of his firm. About the middle of August Mr. Janney requested Mr. Rosen to attend a meeting of the directors, on account of certain developments, and shortly after that date apprised him of the nature of the troubles. At Mr. Rosen's instance the meeting was postponed until August 25th, to enable him to communicate with Mr. Schreiner, who was still in London. On August 22nd he sent to Schreiner a long calbegram in which he stated there seemed to be a large amount of stock not paid in as represented, told him a directors' meeting was called for the next day and asked for instructions. He (Rosen) suggested that he resign as director and stated that he thought it advisable that Schreiner should have Marshall, an associate of Mr. Van Vorst, to represent his interests. He referred to Mr. J. Markham Marshall of the law firm of Underwood, Van Vorst and Hoyt of New York, who had represented the company in some matters, and of which firm Mr. Rosen had at one time been a member. On the next day (August 23) Schreiner cabled Rosen, "Please postpone your decision for a few days," and Rosen again sent a long cablegram to Schreiner. He told him that the directors' meeting was postponed until Saturday, which he would attend, taking Marshall with him, and that he considered it advisable to have Marshall elected. He said there was no doubt that Bryan made false statements regarding the payment of the

capital in full, seemed that there were about 2,200 shares not actually subscribed for, and referred to several matters which were afterwards considered at the meeting.

On August 24th Schreiner sent Rosen a cablegram in which he referred to his letter to his (Rosen's) firm of March 24th as to the payment of shares, and added: "This payment was only made conditionally on such undertaking. If President Bryan's statement March 30 to Ladenburg, contains false statements, I withdraw from our contract and claim stock deal to be null and void, request return of our money paid. Decline assist financing situation. Place my interest in Van Vorst's hands." It resulted in Rosen and Marshall going to Baltimore on August 25th, and there was a meeting of the directors and others that night. In addition to Messrs. Rosen and Marshall a large number of directors, officers and attorneys of the Surety Company and the Commercial and Farmers' Bank, which was interested, were present. Mr. Bryan read a report, and Mr. Gans who had been employed as special counsel by some persons interested in the Surety Company made a statement explaining the conditions, which was supplemented by Mr. Cochen of the American Audit Company who had been examining into the Surety Company's affairs. A number of persons spoke and at times there was great confusion. It seemed to be conceded that there were 2312½ shares of stock which were either in such shape as could not be said to be *bona fide* subscriptions, or were not in the names of persons who were regarded as financially responsible. Mr. Marshall gave notice, *as he said,* that he rescinded the stock contract and demanded the money back, but a number of the witnesses testified he included both the stock and the participation contracts. At the instance of Mr. Baker, who was interested in protecting the Surety Company, the bank and other financial institutions, proposed that those present subscribe for the 2312½ shares of stock, which was done, as the appellee contends, on the distinct condition that the Munich Company waive its asserted right to rescind the stock and participation con-

tracts, which the appellee says was done, while the appellant contends it was only as to the stock. It is admitted that the one was waived and, as we have seen, the bill itself so alleges.

The great preponderance of the testimony is unquestionably in favor of the appellee, on this point in controversy. There were four witnesses on the part of the appellant including Mr. Marshall, who is positive that he only mentioned the stock subscription, and thirteen who sustained the contention of the appellee as to what occurred. It is true the latter differed somewhat as to precisely what was said, and as to what some of them heard, but there can be no doubt that all of them understood from what Mr. Marshall said that the Munich Company was to continue to occupy the same relations it had been holding to the Surety Company.

Before, however, we go into that testimony in detail, it will be well to consider some of the documentary evidence and the admissions of those representing the appellant. It is only just to say before doing so that we do not believe that any of these gentlemen on the part of the appellant intentionally misstated or colored the facts as they recollected them when they testified, but it would seem to be clear that if Mr. Marshall only had in mind, and only knew of, the stock transaction, his principal was fully aware of both, and confirmed his action, supposing it to have had reference to both, and moreover Mr. Marshall used language and did acts which authorized those who subscribed to believe that he fully understood that both contracts were referred-to.

In the first place, the letter dated March 30th, 1906, from Mr. Bryan to Messrs. Ladenburg, Thalmann & Co. began by saying: "Replying to a letter of recent date from Schreiner, Manager of the Munich Re-Insurance Foreign Department, *who have entered into a participating contract with our company,* I respectfully submit the following:"—then follows his statement about the stock. That was addressed to the firm of which Mr. Rosen was not only *a* member, but *the* member who had charge of the Munich Company's interests, and his firm paid for the stock, took it in its name and he

represented the Munich Company as a director in the Surety Company. On August 24th Schreiner sent a cablegram to Rosen in which he said: "If President Bryan's statement of March 30th to Ladenburg contained false statements, I *withdraw from our contract and claim stock deal* null and void." What contract did he mean, that he would withdraw from? The letter mentioned in terms spoke of the *"participating contract,"* and Rosen knew there was no executory contract for subscription of stock, because his firm had paid for and had the stock. But the cablegram on its face spoke of two things—"I withdraw from our contract *and* claim stock deal null and void."

On the same day (August 24th) Mr. Van Vorst cabled to Mr. Schreiner that he must preserve all his rights against everyone, and not prejudice any remedy by hasty action; that Marshall and Rosen would go to Baltimore the next day, that "Marshall will state you have taken firm stand and that it is duty of directors and company to at once either give you solvent company or return your stock. After I have facts I can determine what is wisest to do. Situation critical." On August 25th Schreiner cabled Van Vorst, "Fully concur in your views not to hasten action. With yesterday's cable notified Rosen that decline to participate in further financing. You can wait developments. If misrepresentations are proved *I withdraw from contract and demand return of money paid for shares.* Writing." Mr. Marshall admitted he had interviews with Mr. Rosen on August 24th and 25th, went with him to Baltimore, and had the information contained in the cablegrams and the letter of Mr. Bryan to Ladenburg, Thalmann & Co., as well as others, which were given to his firm by Mr. Rosen, as shown by the latter's letter of August 24th.

The stock subscribed at the meeting of August 25th was paid for on Monday, August 27th, according to agreement, and Mr. Baker so notified Mr. Rosen and Mr. Marshall by telegrams. On August 27th Mr. Van Vorst cabled Schreiner that the matter was adjusted in his opinion satisfactor-

ily, "understood company doing excellent business; trouble not made public; and credit unimpaired.  Under these circumstances believe it would have been most unwise to attempt to rescind, as such course would undoubtedly have entailed final loss on your company.  Marshall sending full details by letter.  When do you expect to be in America?"  Next day Schreiner cabled: "Your information very satisfactory; sail fifth October, Deutchland, for New York."  On the same day Mr. Marshall wrote at length describing Bryan's methods, referred to his letter of March 30th, spoke of the ·subscriptions the night of August 25th and their payment.  He quoted the cablegram from Mr. Van Vorst to him, said they had received his reply, "and notified the Surety Company through Mr. Baker that we waived your right to rescind your subscription."

On August 29th, Van Vorst wrote to Schreiner: "I think the solution of the problem was the wisest.  As stated in my telegram to you, I thought it was up to the directors to give you either a solvent company or to take back your stock, and I think they chose the best horn of the dilemma.  I understand *you have a fairly profitable contract* with the Surety Company.  Had the matter become public it would have been a repetition of the old story—*your contract would have been destroyed,*" etc.  On September 10th, Van Vorst cabled Schreiner: "Has your company re-insured risks on any deposits Mason's Bank?  Give amount, if any," to which he replied, "Mason's Bank possible interest only through re-insurance contract United."

On that day Mr. Van Vorst also wrote a long letter to Mr. Schreiner.  Amongst other things he said they had learned that day that the Surety Company had guaranteed two accounts at Mason's Bank, aggregating approximately $250,000, one on account of the City, and the other on account of the Order of Heptasophs.  He said "The statement was also made that the Munich Re-Insurance Company had re-insured these deposits under its general contract with the United Surety Company."  Again he said "If it be true on

the one hand that your company is re-insuring risks on which its immediate liabilities would be $83,333 I am very thankful that we did not rescind our contract for subscription to the capital stock of the Surety Company, or undertake to rescind our contract of subscription of the 28th," etc. On September 12th, Schreiner wrote Messrs. Underwood, Van Vorst and Hoyt. He acknowledged their letters of August 29th and September 1st, also Mr. Marshall's, and quoted the cablegrams which had passed between them the day before, and then said: "We cannot find that we are interested to any of our friends on Mason's Bank, but it is possible that the United Surety Company may have given some guarantees and in that case we will be interested by our participation contract."

On September 18th, Schreiner acknowledged letter of 10th inst. from Van Vorst, enclosed a copy of the participation contract for their information, and said: "Permit us to point out, however, that the participation contract, and the participation in the stock was one transaction, one part dependent on the other and we believe therefore we would have run no great risk if the action of the "United" had caused the rescission of our participation in the stock. With that naturally the participation contract would also have fallen through."

It would appear from this correspondence that, although Mr. Van Vorst and Mr. Marshall were not aware of all the terms of the participation contract, until perhaps the receipt of the copy enclosed in the letter dated September 18th, they certainly must or ought to have known that there was such a contract. Mr. Marshall not only had the papers in his possession, showing that there was, but *read the letter of March* 30th at the meeting of August 25th, which expressly spoke of it. Then the same cables which directed a demand for the return of the money paid for the shares of stock directed a withdrawal from the contract. Certainly as early as two days after the money was paid to Mr. Baker, in payment in full for the stock, Mr. Van Vorst knew that there was such a

contract, for in his letter of August 29th he said: "I understand you have a fairly profitable contract with the Surety Company," and there is nothing in the testimony to show that he only received that information after August 25th. On the other hand, Mr. Rosen knew of that contract as early as the letter of March 30th, he was a director in the Surety Company, recommended the employment of Mr. Marshall, talked with him in New York, went with him to Baltimore and sat by him at the meeting that night. It is difficult to understand why Mr. Marshall would have attempted to rescind the contract for stock, on the grohnd of fraud and misrepresentation, and yet would not attempt to relieve his client from the more dangerous and burdensome contract, the participation contract, excepting upon the theory that he did not know of its existence or did not appreciate its importance. But it is beyond comprehension that Mr. Rosen, who undoubtedly did know of that contract, as he so testified, would sit quietly by Mr. Marshall during the meeting of August 25th and not inform him—especially as the stock Mr. Marshall was demanding the payment for stood in the name of Mr. Rosen's firm, and he was put in the board of directors to represent it.

Then undoubtedly Mr. Schreiner knew all about it, gave instructions as to both the *"contract and stock deal,"* and must have supposed when he heard from Mr. Marshall and Mr. Van Vorst that they were carrying out his instructions as to both, and not that they were demanding payment for the stock and leaving his company liable under such a contract, especially if the Surety Company was in the hands of those he deemed guilty of false statements, in order to induce him to enter into it. His letter of September 18th, above quoted, shows very clearly how he understood the situation.

Then when we turn to the testimony of the witnesses, what do we find? Justice Gerard, of the Supreme Court of New York, who was a director in the Surety Company, was present with Mr. Janney, Mr. Marshall and Mr. Rosen in

the latter's office, several days before the meeting of August 25th. He testified that Mr. Rosen said that Mr. Marshall would represent the Munich Company and that was the reason he was present, and "that the Munich Re-Insurance Company had become connected with the United Surety Company through making a re-insurance contract with it, and at the same time buying a large amount of the stock of the Surety Company." Mr. Janney said that "When Mr. Marshall came in Mr. Rosen stated to him that the Munich Re-Insurance Company was largely interested in the United Surety Company of Baltimore, both as a stockholder and as the owner of a participation contract, or re-insurance contract, and that the United Surety Company of Baltimore was in some trouble and that I was familiar with it." Mr. Rosen told Mr. Marshall that his firm would doubtless be retained and he should be in touch with the matter from the beginning. Mr. Janney said that Justice Gerard was sent for and came in, that "I recall myself sketching to Mr. Rosen and Mr. Marshall the substance of the contract, but that was all," and "in order to make clear to them the interest which they had in the company I simply sketched the outlines of the contract, the fact that the Munich Company was a participant as to one-third in the profits, and liable for one-third of the losses to the United Surety Company. I did not go into the details of the contract at all."

It is true that Mr. Marshall's recollection is that he never heard of the contract until after the meeting of August 25th, but he is certainly mistaken about that, for he admits he read the letter of March 30th at that meeting which in so many words spoke of it. It can only be explained either on the theory that his mind was on the stock arrangement, and he did not grasp the fact of the other contract, or that he has since forgotten. It is certain, however, as we have seen, that Mr. Rosen knew of it and we do not find in his testimony that he contradicts Justice Gerard or Mr. Janney as to what occurred in his office, although he does say that nothing was said in the conference with Mr. Marshall and

Mr. Van Vorst on the afternoon of August 24th about the participation agreement. That can only be explained by supposing that Mr. Rosen assumed they understood it inasmuch as Mr. Marshall was present when Mr. Janney explained it a few days before. Mr. Rosen stated, however, that he gave Mr. Marshall and Mr. Van Vorst the letters enclosed in his letter of August 24th, one of which expressly refers to that contract, as did also the cables from Mr. Schreiner.

Justice Gerard also testified emphatically as to a conversation he had with Messrs. Rosen and Marshall on the train, on their way to Baltimore, and Mr. Rosen does not deny that, although Mr. Marshall does. As to the meeting of the night of August 25th, Mr. Marshall testified that he read the letter from Mr. Bryan to Messrs. Ladenburg, Thalmann & Co., which we have seen expressly refers to the participating contract. Justice Gerard testified that "Mr. Markham Marshall read some letters and stated on behalf of the Munich Re-Insurance Company he gave notice that he rescinded their re-insurance contract and the purchase of the stock." Mr. G. D. Penniman testified that Mr. Marshall said the Munich Company "would retire from its contract of reinsurance, and would also demand back its stock subscription, or stock payment." Mr. F. H. Gottlieb said that, "Mr. Marshall was very earnest and emphatic in his announcement that as the contents of the letter were false that he gave notice there and then to the meeting on the behalf of the Munich Re-Insurance Company, that the re-insurance contract and their subscription to the stock of the company would be rescinded." Mr. George M. Shriver said: "As I recall, following the reading of the letter of Mr. Bryan to Messrs. Ladenburg, Thalmann & Co., Mr. Marshall made the statement that in view of the misrepresentations that had been made, that the Munich Re-Insurance Company rescinded their contract and their stock subscription." Five or six other persons testified in substance to the same thing.

The testimony shows that Mr. Marshall's remarks created some excitement, and then Mr. Bernard N. Baker addressed

the meeting.  He spoke particularly of the valuable contract with the Munich Company, of which he had been previously told, and said that the stock should be subscribed and paid up.  Those present were called on, and the stock was all subscribed, but before it was, some of them asked Mr. Marshall if the Munich Company would carry out its contract and not demand the money for the stock.  That was testified to in substance by thirteen persons.  They differed in expressing themselves as to just what was said, but there can be no doubt that all of them understood that Mr. Marshall withdrew the proposed rescission of the re-insurance contract and agreed to let the stock remain and affirmed and ratified both, provided the rest of the shares were all subscribed and paid for.  Justice Gerard said that before subscribing he turned to Mr. Rosen and Mr. Marshall, and said to them: " 'I am not going to put my good money up to furnish material for a law suit by the Munich Re-Insurance Company, and I won't put it up unless it is distinctly understood that you withdraw your statement that you are going to rescind the re-insurance contract and the stock purchase, and expressly agree to stand by the contract and stock purchase,' and Mr. Marshall then said that on behalf of the company he would do so, providing the money was paid."

Several witnesses spoke of Justice Gerard's remarks, and also of some made to the same effect by some one representing the directors of the Commercial and Farmers' Bank.  A number of those who subscribed said they would not have done so, had it not been for the statement of Mr. Marshall on behalf of the Munich Company.  The rest of the shares of stock were subscribed for that night, and paid in full by the appointed time on Monday.

We are, then, of the opinion that the decided preponderance of the testimony shows: (1) That Mr. Marshall gave notice of the rescission in such way as justified those hearing him in believing that he referred to the entire relation existing between the two companies, which included that under the participation contract, as well as that in reference to the

stock; (2) That subsequently on that evening he withdrew the rescission and by his action affirmed both contracts, upon the agreement of those present to subscribe and pay for, by Monday, August 27th, the shares of stock which were treated as not actually subscribed and paid for; (3) That his action was the inducement which led the subscribers to take and pay for the stock; and (4), That his action was authorized and ratified by the Munich Company, with such knowledge of the frauds and misrepresentations as binds it by its election to affirm this contract.

It cannot be doubted that the Munich Company could waive its right to rescind, and affirm both contracts. Nor does it seem to us to be less certain that, inasmuch as it made its election, and thereby induced those interested in the Surety Company to pay in nearly $350,000, it cannot now be heard to say, as it in effect does, in a Court of Equity, that "it is true that our action induced those persons to pay into the treasury of the Surety Company that large sum of money, but we have found out since that it is to our advantage to rescind the contract." Call it estoppel, waiver and ratification, or what not, it is what Courts of Equity do not permit to be taken up and laid down at pleasure. There is but little, if anything, known now as to the conditions of the Surety Company which were not, or could not have been, then known. The misrepresentations relied on in the bill were known, and those who put up their money were no better informed than the representatives of the Munich Company. Considerable stress is placed on the fact that Mr. Schreiner was abroad, and remained so until the middle of October, but he was being kept advised from time to time, and if his presence was necessary here for the protection of the Munich Company he ought either to have come at once, or to have at least promptly informed his representatives here that no definite action could be taken until his return, and not let the subscribers to the additional stock pay in their money and then, after his company was strengthened to that extent, unload on them and other innocent people.

The Munich Company was not in ignorance of its rights when it acted. Schreiner, who confessedly had the power to act, not only knew of the participation contract, but he called attention to it in his cablegrams in such way as at least Mr. Rosen, who had been his representative and who was at the meeting, must have known of it, and did as he admits in his testimony, although he may not have known all of its details. If the cablegrams and letters from Mr. Marshall and Mr. Van Vorst showed, as is contended, that they only had in mind or knew of the stock transaction, Mr. Schreiner ought not to have left them in ignorance of the contract, but in point of fact his letter of September 18th shows that he did not so understand their communications.

This opinion is already too long to permit us to further quote from or refer to other testimony, but we have stated above the conclusions of the facts we have reached. It only remains to refer to the law as briefly as we can. In the article on Cancellation of Instruments by Mr. John Norton Pomeroy, 2nd, in 6 *Cyc.*, that learned author, on page 297, has embodied in the text a quotation from JUDGE CHOATE in 7 Fed. 401, where, in speaking of the effect of ratification, it is said: "This doctrine seems to rest not upon the principle of a new contract between the parties, nor yet upon the ordinary principle of estoppel *in pais*, but rather upon a distinct principle of public policy, that all that justice or equity requires for the relief of a party having such cause to impeach a contract is that he should have but one fair opportunity, after full knowledge of the rights, to decide whether he will affirm and take the benefits of the contract or disaffirm it and demand the consequent redress. Any other rule would be regarded as unjust, even toward the party guilty of the wrong out of which grows the right to rescind." In 14 *Am. & Eng. Ency. of Law*, 159, the well known law writer, Mr. W. L. Clark, Jr., thus briefly states the rule as to the effect of an affirmance: "In the first place, a contract cannot be rescinded for fraud after it has once been affirmed, expressly or impliedly, with a full knowledge of the fraud.

The party has a right to rescind, but he is not bound to do so, and when he has once made his election, he is bound by it." See also *Troup* v. *Appleman,* 52 Md. 456, and *Cole* v. *Hines,* 81 Md. 476.

Of course it is not necessary in order to make an election to ratify conclusive, that the party so electing shall be acquainted with all the evidence which may tend to prove the fraud, but it is sufficient if he has knowledge of all the material facts showing the actual perpetration of fraud against him. *Bach* v. *Tuch,* 126 N. Y. 53. In this case there was no doubt about the fraud—that was conceded by all with the exception of Mr. Bryan and possibly one or two others—and the action taken that night was based on the assumption and concession of the misrepresentations.

It is also contended that the rule cannot be applied here because an estoppel *in pais* can only operate between parties and privies in the transaction itself, in respect to which the estoppel is involved. But in the first place this is not a technical estoppel, and the principle, as we have seen above, does not depend upon that. It is true, however, that the action of the Munich Company did induce others to alter their positions, injuriously to themselves, and therefore there is all the more reason why the election made by it should be held to be conclusive. But beyond all that, we are not prepared to say that when those interested in a corporation, as these parties were, meet to ascertain its condition, and consider its welfare, as well as their own, and then enter into an arrangement such as we find was made that night, and was subsequently ratified, a Court of Equity can still be called upon to rescind a contract and declare it null and void on the ground of fraud which was known at the time. It is true the law distinguishes between the corporate entity and the shareholders, but it does not withhold from subscribers of large amounts of money paid in for the benefit of the complaining party, as well as themselves, all protection on such a ground as here relied on—especially as the directors of the corporation were really holding a meeting, and hence

it might well be said that what was done was by the sanction
and act of the corporation itself, through its authorized
agents.   The record .shows that the certificates· of stock were
issued to the subscribers of that night, and the company was
unquestionably to some extent a party to the arrangement.

Nor do we think there is any ground for claiming that
part of the stock subscribed that night was not actually paid.
That is shown beyond. any reasonable doubt.   Some matters
referred to occurred after the stock was taken and the partic-
pation contract was entered into by the parties, which could
scracely be said to be grounds for rescission, even if they had
been relied on in the bill.   So without further discussing
other questions involved in this part of the case, although we
have carefully considered all of them, we are of the opinion
that the appellant is not entitled to a rescission on the
grounds relied on in the bill of complaint.   That brings us
to the consideration of the question raised by the answer to
the part of the answer of the defendant seeking cross-relief.

We have shown above the position taken by the appellant
in its answer to the cross-relief sought by the appellee.   As
the bill proceeds on the theory that the contract was executed
between two competent parties, it may well be doubted
whether the appellant could in that answer be permitted to
raise this question, which is so inconsistent with the ground
of equitable relief relied on in the bill, for, regardless of
other objections to it doing so, it is difficult to see any rea-
son for going into a Court of Equity, if that be a good ground
for declaring this contract null and void.   In this State the
practice of allowing cross-relief to be sought by answer in-
stead of by a cross-bill, when that can be done with justice
to all parties, was early adopted, *Alexander's Chy. Prac.*
111, *Young* v. *Twigg,* 27 Md. 632, but we are not aware of
any case where in the reply it has been permitted to set up
·new grounds for the relief sought in the original bill.   But
as the appellee not only did not make any objection to that
mode of proceeding but joined issue on the matters thus set
out, we will consider the question although irregularly raised.

In doing so, however, we must not be considered as sanctioning the practice.

We considered the first branch of this case on the assumption that the whole stock had not only not been paid for, but that much of it had never been subscribed by *bona fide* subscribers, before August 25th, 1906, as we were then considering the representations to the Munich Company and what occurred ·at the meeting on the date just mentioned. It does not follow, however, that because the subscriptions were of such character that the Munich Company could complain of them they were not in compliance with the requirements of the charter of the Surety Company. The latter would undoubtedly have been complied with, if the 5,000 shares were subscribed and fifty per cent. thereon paid, while the representations to the Munich Company were that all had been subscribed and paid, excepting the 237 shares mentioned in the letter of March 30th.

It must be admitted that the provisions of Section 2 of Chapter 479 of the Laws of 1902, the charter of the Surety Company, seem to have contemplated that the whole of the stock be subscribed before the organization of the company, but it was scarcely intended that as a condition precedent fifty per cent. *on each share* must be actually paid in before it could organize. A more reasonable construction would be that fifty per cent. of the entire capital should be paid, as the Legislature was interested in having such amount of capital paid up as would protect the public in dealing with a corporation which was to have such powers as this charter granted. If fifty per cent. had to be paid on each of the 5,000 shares before the company could organize, it would put it in the power of those interested in rival companies to delay the organization, by subscribing to stock and then refusing to pay. Our general laws only require insurance companies, incorporated under Article 23 of the Code, to have a capital of not less than $100,000, at least one-fifth of which must be paid in before the company shall be competent to transact the business for which it is incorporated. Large

powers are given Trust, Surety and Fidelity companies under our general laws, but they may have a minimum capital of $250,000. Of course these and other provisions of our general laws which we might refer to could not change the provisions of this charter, but they reflect upon the meaning of the Legislature when it used the expression "and when fifty per cent. thereon has been paid in," and show that a more reasonable construction is to require fifty per cent. of the aggregate of the capital, to wit, $250,000, to be paid in before the company organized.

The testimony shows that considerably more than that amount was paid in before this contract was entered into, and we would remark in passing that the Munich Company knew when it made the contract that at least 237 shares of stock had not then been paid, as Bryan's letter of March 30th so states. That would be another reason why a Court of Equity would be averse to placing such a construction on the charter as is now contended for by the appellant, in a case in which it is seeking the aid of that Court to free it from a contract on a ground which it was fully aware of when it made it, unless no other construction was possible. The case of *Franklin Fire Insurance Co.* v. *Hart,* 31 Md. 59, was not only a suit at law, but the terms of that charter were very different from these. In that charter there were 30,000 shares of stock and the provision was "as soon as three thousand shares are subscribed *and paid,* or secured to be paid"—only one-tenth of the capital being required to be paid, and the testimony showed that "no subscriptions were obtained" when the organization was attempted at which Hart was elected secretary, and indeed the parties engaged in trying to procure subscriptions "ceased their efforts and the whole matter seems to have been abandoned by them." Of course under such circumstances no legal organization could be effected.

But here there was not only more than fifty per cent. on the entire capital actually paid in, but the evidence does not show that the whole capital stock was not subscribed—indeed

there is considerable evidence tending to show that it was. We do not want to be understood as approving the kind of subscriptions accepted in a number of instances, but such as they were, together with those which were unquestionably *bona fide* subscriptions by those financially able to pay up and who did pay up, amounted to 5,000 shares. A list sent Schreiner by Bryan as early as November 11th, 1905, showed that there were 5,014 shares subscribed and while many of those were not such subscriptions as Bryan gave Schreiner to understand they were, the testimony does not show that they were not made. On October 25, 1905, there was a subscription in writing for 1,500 shares by T. L. Marsalis, a broker of New York, which was not counted at the meeting of August 25th, 1906, and the 1,000 shares for which Bryan gave his note and then hypothecated the certificate of deposit issued by the Commercial and Farmers' Bank on March 29th, 1906, were also omitted from the valid subscriptions considered at that meeting. While it is perfectly true that that was not such a subscription as Bryan had led the Munich Company to believe he had received, it cannot be said that, as between creditors of the Surety Company and the bank, the latter could have asserted title to that certificate of deposit, if there had been a controversy over it. So without mentioning other items it cannot be said that the evidence shows there were not subscriptions to the 5,000 shares of stock, and although it may be that the State authorities could have instituted proceedings to show that some of them were not *bona fide* subscriptions, and certainly could have required payment in full of all the stock, we are not prepared to extend the rule announced in *Hart's case* so far as to hold that the testimony in this record would justify us in holding that the Surety Company did not come into legal existence by reason of the condition of the subscriptions to the stock when this contract was made.

But if that question of fact be controverted, there are other reasons why this contention of the appellant cannot be sustained. The Surety Company paid all of its bonus and

franchise taxes and on December 27th, 1905, the Insurance Commissioner of Maryland granted and issued it a license to do business in accordance with the laws of Maryland. It actually commenced business on January 2nd, 1906, made its report to the Insurance Commissioner as to what it had done up to December 31st, 1905, and on April 3rd, 1906, while it was carrying on its business, the Act of 1906, Chapter 433, was approved. That was "An Act to amend the charter and extend the powers and repeal certain of the powers of the United Surety Company, incorporated by Chapter 479 of the Act of 1902." In that Act the company is spoken of several times as "said corporation," and although it is true that the Legislature might amend the charter of a company which had never come into existence, and hence action in such case might only be a legislative recognition of the validity of its charter, and not necessarily of its organization, yet when we remember that this company was licensed by the State's officer whose duty it was, before issuing such license, to satisfy himself "by such examination and evidence as he sees fit to make and require, that such company is otherwise duly qualified under the laws of this State to transact business therein," and also recall the supervision that the officers of the State have over such companies and that the Surety Company was in fact organized and carrying on business, we are of the opinion that the Act of 1906 was a recognition of the validity of the corporation and not merely of its charter.

In *Basshor* v. *Dressel,* 34 Md. 503, there was an Act entitled "An Act to amend the charter of the Baltimore Chrome Mining and Manufacturing Company, by empowering the said company to increase its capital stock, or to make calls or assessments upon the present capital stock." JUDGE MILLER said that Act "amongst other things empowers *that corporation* to increase its capital stock to the sum of $750,-000, and if that shall not be done, then to make calls or assessments upon its present capital stock, to the amount of $1 on each share. We regard this Act as a legislative recog-

nition of the validity of the existing corporation, and as having the effect to cure the defect, if any such existed, in the original certificate of combining the two kinds of corporations in one charter." So we are of the opinion that this Act was likewise a "recognition of the validity of the existing corporation"—especially in view of the circumstances we have mentioned. The Legislature undoubtedly had the right to relieve it of the necessity of having all its stock subscribed and fifty per cent thereon paid, if such necessity existed under the charter, and as the State officers whose duties required them to inquire into the validity of the acts of such corporations were recognizing this as a valid corporation, it may well be assumed that the Legislature intended such recognition of it.

But beyond all that, after there was no longer any possible ground to question the payment of the stock the Munich Company fully ratified and confirmed this contract. We have seen what occurred the night of August 25th, 1906, and just afterwards Mr. Marshall was elected a director as its representative and the record abundantly shows that the Munich Company was not only influential but to a large extent controlling in the policy of the Surety Company, particularly after August 25th. On September 28th, 1906, through Mr. Schreiner, it wrote to the Surety Company calling attention to the fact "that we have not received from you the monthly memorandum of business transacted, in accordance with Articles 3 and 5 of our contract with your esteemed company, since the report transmitted us with your letter of July 18th, showing the business up to June 30th. We shall be glad to receive same for the months of July and August at your early convenience." That was promptly replied to, and on October 29th Mr. Hoffman, who was then President of the Surety Company, wrote to Mr. Marshall. who was still a director, enclosing "a copy of the report of the American Audit Co. just received in regard to the account between the Munich Re-Insurance Co. and ours." As

on the first day of November the Munich Company gave notice of the rescission of the contract, it would be difficult to resist the conclusion that the contents of that account were the moving cause of the determination to rescind, and if they had been favorable it is not probable that any inability on the part of the Surety Company to contract would have been suggested. ·

Other evidence might be referred to in order to show that the Munich Company affirmed the contract after the stock was all undoubtedly subscribed and paid, but we deem it unnecessary. While a corporation should not be permitted to lightly brush aside or trifle with any requirements in its charter which the State intended as a condition precedent to its carrying on business, Courts should not construe such conditions more strictly than the language requires when the public would be thereby injuriously affected. The appellant was not only a stockholder and had a representative in the board of directors but it was engaged actively with the appellee in important branches of its work, by way of reinsurance. If it can now escape liability on this ground the appellee could also rely on the same defense and possibly relieve itself of liability to those with whom it contracted during the same time. While such results of themselves would not justify holding either of them liable contrary to fixed principles of law, they can be properly considered in passing on such a question as that now under consideration.

We have not discussed the exceptions to testimony filed by the appellant as from what we have said above it will be seen that we regard the character of testimony objected to relevant and competent, and do not deem it necessary to pass on the interrogatories separately.

The decree of the lower Court dismissed the original bill but declared that the appellee was entitled to cross-relief and referred the cause to the Auditor. As under our practice the answer of the defendant asking for such relief may be treated as in the nature of a cross-bill, and as in a case of this character it is desirable to dispose of the whole matter

in controversy, we deem the decree proper.  2 *Dan. Chy. Pl. and Pr.* (5 ed.) \*1553 n. 3, and will affirm it.

> *Decree affirmed and cause remanded for further proceedings thereunder, the appellant to pay the costs.*